**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **MARK MURPHY,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:11-cv-00114** |
| | ) | **Judge Nixon/Brown** |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| **Defendant.** | ) | |

**To: The Honorable John T. Nixon, Senior United States District Judge**

<u>**REPORT AND RECOMMENDATION**</u>

This action was brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c) to obtain judicial review of the final decision of the Social Security Administration (the Agency), through its Commissioner, denying the plaintiff's applications for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 416(i), 423(d), and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1382, 1382(c). The case is currently pending on the plaintiff's motion for judgment on the administrative record (Docket Entry No. 18), to which defendant has responded (Docket Entry No. 22). For the reasons explained below, the undersigned **RECOMMENDS** that the plaintiff's motion (Docket Entry No. 18) be **DENIED**, and that the Commissioner's decision be **AFFIRMED**.

**I. PROCEDURAL HISTORY**

The plaintiff filed applications for DIB and SSI on July 17, 2007 due to depression, bipolar disorder, and chronic back pain as of April 1, 2001. (Docket Entry No. 12, pp. 75, 130-141, 170) The plaintiff's claims were denied on March 26, 2008 (Docket Entry No. 12, pp. 67-73), and his requests for reconsideration were denied on October 23, 2008 (Docket Entry No. 12, pp. 79-82).

Attorney Donna Simpson was appointed to represent the plaintiff on October 27, 2008. (Docket Entry No. 12, p. 83)  On November 18, 2008, the plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (Docket Entry No. 12, p. 87)  The ALJ – Joan A. Lawrence – held a video hearing on January 26, 2010 at which time both the plaintiff and Attorney Simpson were present.  (Docket Entry No. 12, p. 35)

The ALJ made the following enumerated findings of fact and conclusions of law in her March 25, 2010 decision, the substance of which is quoted below:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2006.

2. The claimant has not engaged in substantial gainful activity since April 1, 2001, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairment:  lower back pain (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with no more than occasional climbing, crawling, and kneeling and no more than mild problems interacting with others, understanding and remembering, and responding to changes.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on November 4, 1970 and was 30 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2001, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Docket Entry No. 12, pp. 18, 20, 27-30)  Based on the foregoing, the ALJ determined that the plaintiff was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Act.  (Docket Entry No. 12, p. 30)

On June 22, 2010, the plaintiff asked the Social Security Appeals Council (the Appeals Council) to review the ALJ's decision.  (Docket Entry No. 12, p. 11)  The Appeals Council denied the plaintiff's request for review on October 13, 2011.  (Docket Entry No. 12, p. 1-3)

The plaintiff brought this action in the district court on November 22, 2011 (Docket Entry No. 1), and the defendant filed an answer on May 2, 2012 (Docket Entry No. 11).  Thereafter, on July 10, 2012, the plaintiff filed a motion and supporting memorandum of law for judgment on the administrative record.  (Docket Entry No. 18-19)  The plaintiff, through counsel, raises the following issues (claims of error) in his motion, the substance of which is quoted below:

1.  The ALJ erred in failing to find Mr. Murphy required the use of a cane and in failing to pose a hypothetical to the Vocational Expert [VE] about the jobs Mr. Murphy could obtain if Mr. Murphy were required to use a cane.

2. The ALJ erred in giving minimal weight to the opinion of Eugene Smith, M.A., the psychological examiner, and in finding Mr. Murphy's mental impairments non-severe.

3. The ALJ erred as a matter of law in evaluating Mr. Murphy's subjective complaints of pain, in failing to apply the regulatory factors set forth in SSR 96-7p and 20 C.F.R. Section 404.1529 and in making her credibility finding in violation of SSR 96-7p.

(Docket Entry No. 19, pp. 11-12, 14)   The plaintiff asks the district court to reverse the Commissioner's decision, or to remand the case for a rehearing.  (Docket Entry No. 19, p. 15)

The defendant filed a response in opposition to the plaintiff's motion on September 21, 2012.  (Docket Entry No. 22)  The defendant argues that the Commissioner's decision should be affirmed because the plaintiff was not disabled within the meaning of the Act.  (Docket Entry No. 22, p. 14)  The plaintiff's motion is properly before the court.

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

Doctor Chris Sewell, M.D. (Dr. Sewell) treated the plaintiff for severe headaches from August 9, 2000 through September 25, 2000.  (Docket Entry No. 12, pp. 358-64)  During this one and one-half month period of time, the plaintiff saw Dr. Sewell a total of four times, and on each visit the plaintiff would complain that his headaches were getting worse.  (Docket Entry No. 12, pp. 358-61)  The plaintiff also complained of nausea and sensitivity to light.  (Docket Entry No. 12, p. 361)

Over the course of these visits Dr. Sewell diagnosed the plaintiff variously with migraine headaches, musculoskeletal headaches, and an intercranial lesion for which he prescribed Anaprox, Flexeril, Inderal, Vicodin, Norvasc, and Imitrex.[1]  (Docket Entry No. 12, pp. 358-61)

---

[1] Doctor Sewell's intercranial lesion diagnosis was based on an August 9, 2000 CT Scan that revealed a "low density area in the upper left cerebellar hemisphere region . . . [that] [was] probably benign and of doubtful clinical significance."  (Docket Entry No. 12, p. 364)  An MRI the following week, on August 17, 2000, revealed no abnormalities.  (Docket Entry No. 12, p. 363)

Doctor Sewell also referred the plaintiff to Dr. Daniel Donovan, M.D., Ph.D. (Dr. Donovan), for the headaches. (Docket Entry No. 12, pp. 227, 358-60)

The plaintiff saw Dr. Donovan on November 2, 2000 for chronic migraine headaches. (Docket Entry No. 12, pp. 225-27) During the appointment, the plaintiff described gradually worsening headaches that occurred at least every other day and could last up to four days. (Docket Entry No. 12, p. 225) Doctor Donovan's impression was that the headaches raised a question of "underlying depressive or anxious disorder," and he opined that the plaintiff might be "depressed at least in a mild to moderate fashion" which could be causing the headaches. (Docket Entry No. 12, p. 226) Doctor Donovan prescribed Depakote, Aspirin, and Vioxx. (Docket Entry No. 12, p. 227)

From November 10, 2000 to February 14, 2001, the plaintiff saw his primary care physician, Dr. William G. Quarles, M.D. (Dr. Quarles). (Docket Entry No. 12, p. 315) He first saw Dr. Quarles on November 10, 2000 at which time the plaintiff was depressed due to the death of his father. (Docket Entry No. 12, p. 315) Doctor Quarles prescribed the plaintiff Zoloft to help with the depression. (Docket Entry No. 12, p. 315) The plaintiff next saw Dr. Quarles on December 12, 2000. (Docket Entry No. 12, p. 315) At this appointment, Dr. Quarles reported that the plaintiff's depression had "much improved" since being prescribed Zoloft, so he continued the plaintiff on Zoloft for "at least" six more months. (Docket Entry No. 12, p. 315) The plaintiff saw Dr. Quarles again on February 14, 2001 at which time the plaintiff reported that his depression was "somewhat better." (Docket Entry No. 12, p. 315) Doctor Quarles again continued the plaintiff on Zoloft for "at least another three months," and he prescribed Narco for his headaches. (Docket Entry No. 12, p. 315)

The plaintiff saw Dr. Jerry Lee Surber, M.D. (Dr. Surber), for a consultative examination on February 6, 2008. (Docket Entry No. 12, p. 241-42) Doctor Surber's impression was that the

plaintiff was obese, with "ongoing depression and anxiety with a bipolar disorder." (Docket Entry No. 12, p. 242) Doctor Surber noted that the plaintiff used a cane, which he told Dr. Surber that he had been using for the past six months. (Docket Entry No. 12, p. 241) Doctor Surber also noted that the plaintiff appeared to be weaker on his left side when standing on his left leg. (Docket Entry No. 12, p. 242) Doctor Surber reported that the plaintiff had not engaged in any physical therapy and that no X-rays, MRIs, or other diagnostic testing had been done concerning his back pain, which the plaintiff claimed began in 2001. (Docket Entry No. 12, p. 242)

The plaintiff visited Mr. Eugene Smith, M.A., Senior Psychological Examiner (Mr. Smith), for a mental status evaluation and clinical interview on February 8, 2008. (Docket Entry No. 12, p. 244, 249) Mister Smith reported that the plaintiff used a cane for assistance in walking to the examination room and that the plaintiff walked with a "significant limp." (Docket Entry No. 12, p. 244) During the examination, Mr. Smith also noted that the plaintiff "showed considerable problem" sitting and standing, which the plaintiff told Mr. Smith was due to his back pain. (Docket Entry No. 12, p. 244) The plaintiff also told Mr. Smith that, in August 2007, he was prescribed Prozac for depression. (Docket Entry No. 12, p. 246) The plaintiff denied receiving any mental health treatment other than prescription medications. (Docket Entry No. 12, p. 246) However, he did admit to Mr. Smith that he had been previously referred to a local community mental health facility. (Docket Entry No. 12, p. 246)

Mister Smith found that the plaintiff's immediate, recent, and remote memories were intact; that the plaintiff was oriented to time, place, and circumstance; and that the plaintiff did not have any thought process disorders. (Docket Entry No. 12, p. 247) Mister Smith reported that the plaintiff's thoughts were "logical, sequential, and [that] there was no tangential thinking." (Docket Entry No. 12, p. 247) However, Mr. Smith's impression was that the

plaintiff was "highly focused circumstantial to his back problems," and the plaintiff reported overwhelming feelings of "helplessness and hopelessness and worthlessness." (Docket Entry No. 12, p. 247) Overall, Mr. Smith was of the opinion that the plaintiff functioned in "the average range of intelligence." (Docket Entry No. 12, p. 248)

Mister Smith further reported that the plaintiff would have difficulty interacting in an emotionally stable work fashion with supervisors, peers, and the public due to his depression. (Docket Entry No. 12, p. 248) He also stated that it would be difficult for the plaintiff to concentrate and focus and that the plaintiff would not be able to sustain and persist over the course of a usual work day "because of his depression." (Docket Entry No. 12, p. 248) Mister Smith diagnosed the plaintiff with bipolar disorder "by history only." (Docket Entry No. 12, p. 248)

On March 12, 2008, the plaintiff met with Dr. Robert L. Paul, Ph.D. (Dr. Paul), for a mental residual functional capacity assessment. (Docket Entry No. 12, pp. 294-96) Doctor Paul found that the plaintiff was only moderately limited in his ability to carry out detailed instructions and in his ability to maintain attention and concentration for extended periods of time. (Docket Entry No. 12, p. 294) Doctor Paul found further that the plaintiff was only moderately limited in his ability to respond to changes in his social setting and in his ability to complete a normal work day or work week. (Docket Entry No. 12, p. 295)

Doctor Paul also conducted a psychiatric review and found that the plaintiff had a mild restriction on his daily living activities; mild difficulties maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; but that there were no episodes of decompensation each of extended duration. (Docket Entry No. 12, p. 268) Furthermore, Dr. Paul summarized his session with the plaintiff as the following, the substance of which is quoted below:

> Cl presents with hx of depression. **Allegation of Bipolar are not supported by available MER. Allegations in general appear only partially credible.** MER indicates mild to moderate overall MH limitations. MSS by CE vendor is vague in parts and not entirely supported by own MSE findings - **Psych CE therefore assigned less than full wgt. No other medical source statement found in file.** Cl appears limited more by physical rather than mental factors. A listing is not met. See MRFC. Per Psych CEo cl is capable.

(Docket Entry No. 12, p. 270)(emphasis added)

The plaintiff met with Dr. Marvin Cohn, M.D. (Dr. Cohn), on March 20, 2008 for a physical residual functional capacity assessment. (Docket Entry No. 12, pp. 286-93) Doctor Cohn found that the plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, could stand or walk for six out of an eight-hour work day, and that he could sit for six out of an eight-hour work day. (Docket Entry No. 12, p. 287) Doctor Cohn also found that the plaintiff could occasionally climb, balance, stoop, kneel, crouch, or crawl. (Docket Entry No. 12, p. 288) Doctor Cohn noticed that the plaintiff walked with a cane but that the cane was not prescribed. (Docket Entry No. 12, p. 293)

From May 9, 2008 to October 7, 2009, Dr. Vijaya Patibandla (Dr. Patibandla) treated the plaintiff at the Fentress Internal Medicine Center. (Docket Entry No. 12, pp. 317-30) Starting on May 9, 2008, the plaintiff saw Dr. Patibandla at least once a month predominantly for back pain but for anxiety and depression as well. (Docket Entry No. 12, pp. 317-30) Over the course of these visits, Dr. Patibandla prescribed a number of different medications including Endocet, Zoloft, and Valium. (Docket Entry No. 12, pp. 317-30) During these visits, Dr. Patibandla twice noted the plaintiff's use of a cane. (Docket Entry No. 12, p. 323-24)

The plaintiff visited Dr. Glenda D. Knox-Carter, M.D. (Dr. Knox-Carter), for a second physical residual functional capacity assessment on October 15, 2008. (Docket Entry No. 12, pp. 306, 313) Doctor Knox-Carter found that the plaintiff could occasionally lift 20 pounds;

frequently lift 10 pounds; stand or walk for six out of an eight-hour work day; sit for six out of an eight-hour work day; was unlimited as to the amount that he could pull or lift; and that he could occasionally climb, balance, stoop, kneel, crouch, and crawl.  (Docket Entry No. 12, pp. 307-08)  During this assessment, Dr. Knox-Carter noted that the plaintiff was using a cane that seemed related to his back pain, but she also noted that the cane was not prescribed.  (Docket Entry No. 12, p. 313)  Doctor Knox-Carter also noted that in the initial interview, on July 17, 2007, the plaintiff failed to mention the need for a cane or that he was having sitting problems.  (Docket Entry No. 12, p. 313)  Finally, Dr. Knox-Carter noted that the plaintiff's back pain started in 2001.  (Docket Entry No. 12, p. 313)

On December 23, 2009, the plaintiff was seen by Senior Psychological Examiner Jerell F. Killian, M.S. (Mr. Killian) for a psychological evaluation.  (Docket Entry No. 12, p. 365, 367)  During the session, Mr. Killian noted that the plaintiff "moved about with unrestricted mobility" and exhibited no physical limitations during their session.  (Docket Entry No. 12, p. 365)  Mister Killian also noted that the plaintiff provided detailed, sequential personal history and that it appeared from the plaintiff's school records that the plaintiff received specialized instruction; however, the plaintiff was able to complete the requirements necessary to receive a regular high school diploma.  (Docket Entry No. 12, p. 365)  Mister Killian concluded that the plaintiff's IQ results placed him in the borderline range, and that individuals in this range are generally capable of performing activities that require assessment and problem solving, but that such individuals are usually restricted to unskilled, physical work.  (Docket Entry No. 12, p. 367)

**B.  Testimonial Evidence**

**1.  Plaintiff's Testimony**

The plaintiff testified before the ALJ that he was 39 years old.  (Docket Entry No. 12, p. 38)  The plaintiff also testified that he had received some specialized education but that he had

obtained a regular high school diploma. (Docket Entry No. 12, p. 49) When asked about his back pain, the plaintiff stated that it started in 2000 when he worked construction and was required to lift heavy objects. (Docket Entry No. 12, pp. 41-42) The plaintiff opined that his back pain stemmed from improper lifting technique when lifting objects normal for a construction job. (Docket Entry No. 12, p. 42)

To help with the back pain, the plaintiff testified that he had been using a cane for over two years. (Docket Entry No. 12, p. 52) He further testified that the cane had not been prescribed by any of his physicians but that he used it because he believed it helped his back pain. (Docket Entry No. 12, p. 52) As far as actual treatment, the plaintiff testified that he had only tried different medications to help with his back pain. (Docket Entry No. 12, p. 43) There had been no MRIs, X-Rays, or other tests done on his back to determine whether there were any medical problems with his back. (Docket Entry No. 12, p. 43) Also the plaintiff had not seen any neurologists, pain management doctors, or physical therapists to help relieve or manage his back pain. (Docket Entry No. 12, p. 43)

At the hearing, the plaintiff also testified that he had problems with anxiety and depression which started in 2000. (Docket Entry No. 12, p. 43) The plaintiff stated that his father passed away and alleged that since the passing of his father, it had been difficult for him to interact with others. (Docket Entry No. 12, pp. 43-44) When asked what particularly upset him in regards to dealing with others, the plaintiff stated only that he had difficulty reasoning with others. (Docket Entry No. 12, p. 44) As it related to treatment, the plaintiff testified that he had only been prescribed medications to treat his anxiety and depression but that he had not received any other form of treatment. (Docket Entry No. 12, pp. 44-45)

### 2. Vocational Expert's Testimony

At the hearing, the VE, Dr. Ernest W. Brewer, testified that the plaintiff's prior classification ranged from medium to heavy, skilled to unskilled. (Docket Entry No. 12, pp. 58-59) The ALJ asked the VE to consider vocational significance of the following: 1) an individual with the same work history and education as the plaintiff; 2) who is restricted to light extertional level; 3) who can do no more than occasional climbing, balancing, stooping, bending, crouching, crawling, or kneeling; 4) who has a limited but satisfactory, or mild problem in the areas of interacting with supervisors, maintaining attention and concentration, understanding, remembering and carrying out detailed instructions, responding appropriately to changes in the work setting, completing a normal work week, relating to coworkers and dealing with the public; and 5) who could not return to his prior work. (Docket Entry No. 12, pp. 59-60)

The VE testified that a person restricted to the given limitations could perform jobs in the area of food preparation, light janitorial work, and laundry folding. (Docket Entry No. 12, p. 60) As to the number of jobs available in the community, the VE found: 1) there are 14,050 food preparation jobs in Tennessee and 298,000 jobs in the nation; 2) there are 6,300 light janitorial jobs in Tennessee and 290,000 jobs in the nation; and 3) there are 3,200 laundry folding jobs in Tennessee and 175,000 jobs in the nation. (Docket Entry No. 12, p. 60)

The ALJ then modified the parameters to the same restrictions but at the sedentary exertional level. (Docket Entry No. 12, p. 60) When asked if there would be work at this level, the VE testified that there are jobs in the areas of assembly type work, hand-packaging, and inspector or grader type jobs. (Docket Entry No. 12, pp. 60-61) As to the number of jobs available in the community, the VE found: 1) there are 4,250 assembly jobs in Tennessee and 108,000 in the nation; 2) there are 1,580 hand-packaging jobs in Tennessee and 87,000 jobs in

the nation; and 3) there are 1,300 inspector or grader jobs in Tennessee and 79,000 jobs in the nation. (Docket Entry No. 12, pp. 60-61)

In a third hypothetical, the ALJ asked about sit-stand options. (Docket Entry No. 12, p. 61) The ALJ asked if the individual required a sit or stand option for every 15 to 30 minutes, how would this affect the person's ability to get the jobs discussed. (Docket Entry No. 12, p. 61) The VE responded that it would eliminate the person's ability to do the preparation work and the janitorial jobs. (Docket Entry No. 12, p. 61)

The ALJ next asked the VE to apply the prior restrictions to a person marked with severe problems dealing with people, and she asked how this would affect the person's ability to find a job. (Docket Entry No. 12, p. 61) The VE replied that it would be difficult for a person to meet the minimum requirements for work with this restriction because it would be difficult for that person to interact with their coworkers and supervisors under these restrictions. (Docket Entry No. 12, p. 61)

In a final hypothetical, the ALJ asked the VE to consider an individual who suffered from severe pain on a daily basis or almost daily basis so much so that the person was unable to complete an eight-hour work day. (Docket Entry No. 12, p. 61) The VE replied that, to his knowledge, there would not be any job that would exist in significant numbers that such person could perform. (Docket Entry No. 12, p. 61)

### III. ANALYSIS

**A. Standard of Review**

The district court reviews the final decision of the Commissioner to determine whether the Commissioner's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of

evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  Even if the evidence could also support a different conclusion, the Commissioner's decision must stand if substantial evidence supports the conclusion reached.  *Her v. Comm'r of Soc Sec.*, 203 F.3d 388, 389 (6th Cir. 1999).

**B. Proceedings at the Administrative Level**

The plaintiff has the ultimate burden to establish an entitlement to benefits by proving his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The plaintiff's "physical or mental impairment" must "result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *Id.* at § 423(d)(3).  In proceedings before the Agency, a plaintiff's case is considered under a five-step sequential evaluation process.  The process is "sequential" because the process ceases at the first step where a finding of disabled or not disabled is made.  *See Barnhart v. Thomas,* 540 U.S. 20, 24 (2003); *See also Mowery v. Heckler*, 771 F.2d 966, 969 (6th Cir. 1985).  The five-step process is as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of the medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to

Subpart P of the Regulations.  Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 539 (6th Cir. 2007)(*citing, e.g.*, *Comb v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006)(*en banc*)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The burden of proof shifts to the Agency in step five.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  The Agency's burden can be carried by relying on the medical-vocational guidelines, but only if the plaintiff is not significantly limited by a nonexertional impairment, and then only when the plaintiff's characteristics identically match the characteristics of the applicable guideline number.  *See Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003).  In cases where the guidelines do not direct a conclusion as to the plaintiff's disability, the Agency must rebut the plaintiff's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through a VE's testimony.  *Id. at* 616; *see also Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

## C.  Plaintiff's Claims of Error

**1. Whether the ALJ failed to find that Mr. Murphy required the use of a cane and whether the ALJ failed to pose a hypothetical to the VE about jobs that Mr. Murphy could obtain if Mr. Murphy were required to use a cane.**

The plaintiff asserts that the ALJ erred in failing to find that Mr. Murphy required the use of a cane and that the ALJ also erred because she did not pose a hypothetical to the VE about

14

jobs requiring the use of a cane.  (Docket Entry No. 19, p. 11)  The plaintiff directs the court's attention to the physical examination on February 6, 2008 where Dr. Surber noted in his report that the plaintiff used a cane for a portion of the examination.  (Docket Entry No. 19, p. 11)  The plaintiff also directs the courts attention to the plaintiff's consultation where the plaintiff's use of a cane was also noted in Mr. Smith's report.  (Docket Entry No. 19, p. 11-12)  The plaintiff goes on to add that the ALJ only noted once where the plaintiff's treating physician acknowledged a cane in the record when the treating physician actually noted the cane on two different visits to Dr. Patibandla.  (Docket Entry No. 19, p. 12)  The plaintiff asserts that the ALJ's failure to take these pieces of evidence into consideration caused the ALJ ultimately to find that a cane was not necessary, which ultimately led to the ALJ's failure to pose a hypothetical to the VE of a person requiring a cane.  (Docket Entry No. 19, p. 11-12)

In response, the defendant argues that the plaintiff is asking the court to reweigh the evidence in this case and that this should not be allowed because it is the ALJ's duty to evaluate the evidence and determine whether the plaintiff required a cane.  (Docket Entry No. 22, p. 7)  The defendant goes on to assert that there is substantial evidence to support the ALJ's decision.  (Docket Entry No. 22, p. 8)  He argues that the plaintiff has only brought forth one piece of new evidence which is that the use of a cane was documented by Dr. Patibandla on the plaintiff's February 11, 2009 visit.  (Docket Entry No. 22, p. 8)  The defendant asserts that even if this new evidence were true that there is still ample evidence to show that the ALJ made the proper assessment of the plaintiff's cane use.  (Docket Entry No. 22, p. 8)  The defendant points out that out of more than 15 visits the plaintiff can only point to two of those visits where the plaintiff's treating physician noted the use of a cane.  (Docket Entry No. 22, p. 8)  The defendant argues that two visits are no more significant than the one visit, where the cane is documented.  (Docket

Entry No. 22, p. 8-9) Therefore, the defendant asserts that the ALJ's decision should be upheld.

(Docket Entry No. 22, p. 8-9)

In her decision dated March 25, 2010, the ALJ wrote the following as it pertains to the plaintiff's use of a cane, the substance of which is quoted below:

> The undersigned also notes that there is contradicting evidence in the record pertaining to the claimant's use of a cane. The claimant stated at the hearing that he had been using his cane for 2 years and during his consultative physical examination in February 2008 Dr. Jerry Surber did note that the claimant was using a cane for support during the gait and station portions of the examination. Two days later Dr. Eugene Smith,[2] a consultative psychologist, also noted that the claimant was using a cane and he noted that the claimant had a significant limp. The undersigned notes, however, that **there is nothing in the evidence to show that the claimant's cane was ever prescribed by a treating physician. It appears, instead, that he obtained this cane on his own. It is also significant to note that the claimant's treating doctor, Dr. Patibandla, mentioned the claimant's cane on only one occasion during, in January 2009, even though he had seen the claimant on a fairly frequent basis during the period from May 2008 through October 2009. It is also very significant to note that during a recent psychological evaluation performed on December 23, 2009, Dr. Jerell F. Killian[3] noted that the claimant "moved about with unrestricted mobility, and he exhibited no physical limitations for this session."**

(Docket Entry No. 12, pp. 23-24)(emphasis added) These findings led to the ALJ's decision that the cane was not required, which resulted in her not posing a question to the VE about a person requiring the use of a cane. (Docket Entry No. 12, pp. 23-24)

As an initial matter and as previously established, *supra* at p. 13, a "physical impairment" must "result from anatomical, physiological, or psychological abnormalities which are

---

[2] The ALJ mistakenly referred to Mr. Smith as "Dr. Smith." Mister Smith has a M.A. He is not a M.D. or a Ph.D. (Docket Entry No. 12, p. 244)

[3] The ALJ mistakenly referred to Mr. Killian as "Dr. Killian." Mister Killian has a M.S. He is not a M.D. or a Ph.D. (Docket Entry No. 12, p. 367)

demonstrable by medically acceptable clinical and laboratory diagnostic techniques." There is nothing in the record that shows the plaintiff's need to use a cane was determined by any "medically acceptable clinical and laboratory" technique.

In any event, the Sixth Circuit has held that if a cane is not a necessary device for the claimant's use, it cannot be considered a restriction or limitation on the plaintiff's ability to work. *Carreon v. Massanari*, 51 Fed.Appx. 571, 575 (6th Cir. 2002). This device must be so necessary that it would trigger an obligation on the part of the Agency to conclude that the cane is medically necessary. *Penn v. Astrue*, 2010 WL 547491, at *6 (S.D. Ohio Feb. 12, 2010). A cane would be medically necessary if the record reflects more than just a subjective desire on the part of the plaintiff as to the use of a cane. *Id.* If the ALJ does not find that such device would be medically necessary, then the ALJ is not required to pose a hypothetical to the VE. *Casey v. Sec'y of Health Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). The ALJ is only required to pose to the VE those limitations found to be credible. *Id.*

There is substantial evidence in the record to support the ALJ's decision that the plaintiff's cane use was not medically necessary. First, as previously noted, the cane was never prescribed by any physician, treating or otherwise. Second, at the hearing before the ALJ, the plaintiff was asked if the cane was prescribed, to which the plaintiff only replied that he started to use the cane, on his own, because he felt that it helped with his back pain. (Docket Entry No. 12, p. 52) Finally, at his visit with Mr. Killian, Mr. Killian noted that the plaintiff "moved about the room with unrestricted mobility, and he exhibited no physical limitations for this session." (Docket Entry No. 12, p. 365) For these reasons, the ALJ did not err in finding that the plaintiff did not require the use of a cane, nor did she err in not posing a cane-related question to the VE. Accordingly, this argument is without merit.

**2. Whether the ALJ erred in giving minimal weight to the opinion of Eugene Smith, M.A., the psychological examiner, and whether the ALJ erred in finding Mr. Murphy's mental impairments non-severe.**

The plaintiff argues that the ALJ erred in rejecting Mr. Smith's psychological report. (Docket Entry No. 19, p. 13)  The plaintiff also argues that the ALJ further erred in finding the plaintiff's mental impairments were non-severe.  (Docket Entry No. 19, p. 13)

The defendant argues that the ALJ's decision to discount Mr. Smith's opinion is supported by evidence and that the ALJ gave several reasons for discounting Mr. Smith's opinion.  (Docket Entry No. 22, p. 9)  The defendant argues first that most of the negative connotations placed in Mr. Smith's report was based on information given to Mr. Smith by the plaintiff himself.  (Docket Entry No. 22, p. 10)  The defendant then directs the court to Mr. Smith's findings that the mental status examination was normal with the exception of the plaintiff's reporting of overwhelming feelings of helplessness, hopelessness, and worthlessness. (Docket Entry No. 22, p. 10)  The defendant asserts that this information supports the ALJ's decision that Mr. Smith's opinion was again mainly based on the subjective complaints of the plaintiff.  (Docket Entry No. 22, p. 10)  In response to the plaintiff's argument that the ALJ erred in finding that the plaintiff's mental impairments were non-severe, the defendant argues that this argument is the same as the plaintiff's argument concerning the weight of Mr. Smith's opinion. (Docket Entry No. 22, p. 11)

The ALJ is not required to show any specific form of deference to consultative examiners such as Mr. Smith.  *Madden v. Comm'n of Soc. Sec.*, 184 F. Supp 2d 700, 706 (S.D. Ohio 2001). Moreover, if the ALJ finds that the evidence conflicts, she may make the decision as to the ultimate result, so long as her decision is supported by substantial evidence.  *Id.*  Furthermore, a severe impairment is an impairment that significantly limits the plaintiff's mental and physical ability to do basic work activities.  *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed.Appx. 425, 428 (6th

Cir. 2007).  A non-severe impairment is an impairment that does not significantly limit the plaintiff's ability to do basic work activities.  *Farris v. Sec'y of Health and Human Servs.*, 773 F.2d 85, 88 (6th Cir. 1985).  To determine the difference between the two types of impairments, the question is whether the impairment prevents the claimant from doing work.  *Id.*  If there is more than a "minimal effect" on a plaintiff's ability to do work, then the ALJ must find that the impairment is severe.  *Griffeth*, 217 Fed.Appx. at 428.  However, if the impairment only presents a "slight abnormality" and has such a "minimal effect" that it would not interfere with the plaintiff's ability to do work, then it is a non-severe impairment.  *Farris*, 773 F.2d at 90.

The ALJ stated the following as it pertains to Mr. Smith's opinion and the plaintiff's mental impairments:

> The claimant also testified at his hearing that he has been experiencing depression since 2000 and he stated that he does not get along with other people.  **It is significant to note, however, that the claimant has never sought outpatient mental health treatment and he has never required inpatient hospitalization due to any psychiatric problems.  The evidence also shows that the claimant had an excellent response to psychotropic medications when he was taking them.**  Treatment notes from Overton County Medical Center shows the claimant was given some Zoloft back in November 2000 after his father passed away.  At his very next visit in December 2000 **the claimant was noted to be "much improved" since being started on the Zoloft.**  The undersigned also notes that during his psychological examination in February 2008 the claimant seemed to be highly focused on his back pain alone.  **His mental status examination was also essentially normal.**  He was alert and oriented times 4, he was cooperative, he was able to maintain concentration to perform serial 3's and recite the months of the year both forward and backward, his memory was intact, he appeared to be of average intelligence, he denied any suicidal or homicidal ideations, and there was no evidence of a thought disorder or psychosis.  Despite the lack of findings on mental status examination, the examining doctor did diagnose the claimant with major depression and he opined that the claimant would have difficulty interacting in an emotionally stable manner with supervisors, peers and the public, he would have difficulty concentrating and

focusing his attention, and he would not be expected to sustain and persist across the usual work day because of his depression. **This opinion is given minimal weight herein, as it is clearly based solely on the claimant's subjective complaints during the examination and not any actual clinical findings.** The undersigned also again notes that **the claimant has sought no outpatient mental health treatment and has, instead, relied solely on prescription medications given to him by his primary care physician.** Treatment notes from Dr. Patibandla also show that he is primarily been maintained on Valium.

It is also significant to note that **during the psychological examination** performed by Dr. Killian in December 2009 **the claimant made absolutely no mention of any depressive symptoms.** In fact, Dr. Killian noted that the claimant was "currently unable to work due to physical problems which include bulging discs." **Surely if the claimant were experiencing such severe depressive symptoms he would have at least mentioned these symptoms to Dr. Killian.**

The undersigned notes that the claimant graduated from high school and received a regular education diploma. He also has a fairly strong work history and has performed skilled work in the past. It is also very significant to note that after a clinical interview with the claimant and a review of the claimant's education and work history, Dr. Smith, the consultative psychologist who saw the claimant in February 2008, actually thought the claimant was functioning in the average range of intelligence.

(Docket Entry No. 12, pp. 24-26)(emphasis added) For the reasons stated above, the ALJ decided the plaintiff had no more than mild problems understanding and remembering, interacting with others, and responding to changes due to his depression. (Docket Entry No. 12, p. 26)

The ALJ's decision to give minimal credit to Mr. Smith's opinion is supported by substantial evidence. Mister Smith is a consultative psychological examiner, so as stated above, the ALJ is not required to award any specific degree of deference to his opinion. Furthermore, the record supports the ALJ's findings. In Mr. Smith's report, he stated, on the one hand, that

the plaintiff's mental status examination was for the most part normal. (Docket Entry No. 12, pp. 246-48) He then notes later that the plaintiff reported overwhelming feelings of hopelessness, helplessness, and worthlessness, which appears to be his reasoning for finding that the plaintiff would have difficulty interacting with others in an emotionally stable environment and persisting and sustaining through an eight-hour work day. (Docket Entry No. 12, pp. 247-48)

The evidence referred to above does appear to conflict in this case. On the one hand, Mr. Smith finds that the plaintiff's mental state is essentially normal, and he does a lot of different clinical techniques to make this determination. However, on the other hand, the plaintiff reports overwhelming feelings of helplessness, hopelessness, and worthlessness, which causes Mr. Smith to diagnose the plaintiff with bipolar disorder. Mister Smith then diagnoses the plaintiff with bipolar disorder, even though there does not appear to be any evidence in Mr. Smith's findings which would lead to this conclusion. As stated above, when the evidence conflicts, the ALJ is allowed to make the final determination as long as her decision is supported by substantial evidence. At this point, the evidence appears to be conflicting, so the ALJ may make a finding as to how the evidence is weighed. There is also substantial evidence in the record to support her conclusion. For the reasons stated above, the ALJ's decision should be upheld.

There is also substantial evidence in the record to support the ALJ's decision that the plaintiff's mental impairments are non-severe. After the plaintiff's father passed away, he went to visit Dr. Quarles and received Zoloft for depression. (Docket Entry No. 12, p. 315) His next visit with Dr. Quarles, Dr. Quarles reported that the plaintiff's depression was "much improved," so the plaintiff was continued on Zoloft. (Docket Entry No. 12, p. 315) The plaintiff also reported in a third visit to Dr. Quarles that he believed his depression was somewhat improving. (Docket Entry No. 12, p. 315) Furthermore, the plaintiff also testified at his hearing that he had

not received any other treatment for his depression. (Docket Entry No. 12, pp. 44-45) The plaintiff has been referred to a facility but the record does not reflect that the plaintiff ever followed up on the referral. (Docket Entry No. 12, p. 246)

As stated by the ALJ, the plaintiff's argument is not compelling. The plaintiff argues that his mental impairment is severe but will not go to a facility to receive the help that he allegedly requires. In addition, the Magistrate Judges agrees with the ALJ that the plaintiff has seemed to manage his mental impairments well with medication. For the reasons explained above, the ALJ did not err in determining that the plaintiff's mental impairments were non-severe. Accordingly, this argument is without merit.

**3. Whether the ALJ erred in evaluating Mr. Murphy's subjective complaints of pain, in failing to apply the regulatory factors set forth in SSR 96-7p and 20 C.F.R. Section 404.1529 and in making her credibility finding in violation of SSR 96-7p.**

The plaintiff argues that the ALJ erred in not considering the record as a whole when reaching her credibility finding and, as such, she violated SSR 96-7p. (Docket Entry No. 19, p. 14) The plaintiff further argues that under SSR 96-7p and 20 C.F.R. 404.1529 there are factors that the ALJ must consider, and a failure to consider those factors warrants remand. (Docket Entry No. 19, p. 14)

The defendant argues that the ALJ did perform the proper credibility analysis and that the ALJ was justified in finding that the plaintiff's subjective complaints were not entirely credible. (Docket Entry No. 22, p. 13) The defendant asserts that, under SSR 96-7p and C.F.R. 404.1529, there is a two-step process and that the ALJ followed this process. (Docket Entry No. 22, p. 13) The defendant argues further that the ALJ summarized the evidence in the record and gave more than enough reasons for her finding that the plaintiff's subjective complaints were not entirely credible. (Docket Entry No. 22, pp. 13-14)

The absence of objective medical evidence to support the plaintiff's subjective complaints places the plaintiff's credibility at issue. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). The ALJ is not required to accept the plaintiff's subjective complaints but instead may make a credibility determination as to the plaintiff's credibility. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). The ALJ's determination as to the plaintiff's credibility is to be given great deference and weight. *Walters*, 127 F.3d at 531. This is so because the ALJ is present during the hearing and is able to observe the plaintiff, the witnesses, and their demeanor as well as their credibility. *Id.* Therefore, since deference must be given to the ALJ's determination, the court is limited to determining only whether the ALJ's determination is supported by substantial evidence. *See Jones*, 336 F.3d at 476.

The ALJ stated the following as it pertains to the plaintiff's subjective complaints of back pain, the substance of which is quoted below:

> In terms of the claimant's alleged back pain, the undersigned notes that **the claimant has never undergone any x-rays or MRI scans of his back** to document the presence of any abnormalities in his spine. **He has never received physical therapy** and **has never undergone any pain management treatment. He actually did not receive any medical treatment for his complaints of back pain until May 2008, over 7 years after his alleged onset date of April 1, 2001.** Treatment notes from his primary care physician, Dr. Vijaya Patibandla, also fail to support the claimant's allegations of disabling pain. Although his treatment notes do repeatedly indicate that the claimant had tenderness of his lumbar spine, **there was no mention of any neurological abnormalities.** The undersigned also notes that **Dr. Patibandla never referred the claimant to a neurologist or neurosurgeon for further evaluation of his back pain and he never referred the claimant to a pain management doctor.** Surely if the claimant's pain were as severe as he has alleged, his treating doctor would have referred him to a specialist for further evaluation.
>
> In his testimony at the hearing, **the claimant also indicated that he could perform minimal household chores and other daily activities as a result of pain.** However, **the claimant's**

**allegations concerning marked difficulties in performing daily and work -related activities are not confirmed in the medical evidence** of record as a whole. **No treating or examining physician documented, with sufficient medical facts and clinical findings, any impairment and related symptoms**, which would occasion the alleged persistent functional limitations. The evidence demonstrates that the claimant can care for his personal needs. Furthermore, he should be able to perform his daily and other activities within his residual functional capacity established herein.

(Docket Entry No. 12, pp. 22-23)(emphasis added)

The Magistrate Judge agrees with the ALJ. As it pertains to the plaintiff's back pain, there are no MRIs, X-Rays, or other tests that show abnormalities which would confirm the plaintiff's allegations. There is also no documentation in the record to show that the plaintiff has tried any other form of treatment like physical therapy or a pain management doctor. Furthermore, there is also no medical evidence in the record to confirm that the plaintiff does not have the ability to do activities within his residual functional capacity. None of his physicians have stated that the plaintiff cannot engage in minimal household chores or daily activities. Therefore, because there was not any objective medical evidence in the record to confirm the plaintiff's allegations, the ALJ was allowed to make the credible finding that she did.

Finally, the ALJ addressed the plaintiff's depression and anxiety. (Docket Entry No. 12, p. 24) In her opinion, there were some inconsistencies as to the plaintiff's allegations when compared to the record. (Docket Entry No. 12, pp. 24-25) The ALJ found it unusual that the plaintiff alleges experiencing depression since 2000 but has not sought inpatient hospitalization or outpatient mental health treatment. (Docket Entry No. 12, p. 24) In her view, she also found it to be unusual that the plaintiff never mentioned to Mr. Killian in their session that he was experiencing any depressive symptoms. (Docket Entry No. 12, p. 25) She stated, "Surely if the claimant were experiencing such severe depressive symptoms he would have at least mentioned

these symptoms to [Mr.] Killian." (Docket Entry No. 12, p. 25) With these pieces of evidence and the fact that the plaintiff appeared to be responding well to his medications, the ALJ properly found that the plaintiff's subjective complaints as to his depression were not credible. (Docket Entry No. 12, pp. 24-25)

The ALJ's conclusion is supported by substantial evidence, after review of the record. Therefore, for all of the above reasons, The Magistrate Judge concurs with the ALJ.

## IV.  CONCLUSION

The ALJ applied the proper legal standards in her decision, and her final decision was supported by substantial evidence in the record.

## V.  RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 18) be **DENIED**, and that the Commissioner's decision be **AFFIRMED**.

The parties have **FOURTEEN (14) DAYS** within being served with a copy of this Report and Recommendation, to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this Report and Recommendation within **FOURTEEN (14) DAYS** after being served with a copy thereof. Failure to file specific objections within **FOURTEEN (14) DAYS** of receipt of this Report and Recommendation may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 6th day of March, 2013.

/s/Joe B. Brown_____
Joe B. Brown
U.S. Magistrate Judge